IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

MAX ANDERSON, d/b/a Anderson Dairy;
JESSE L. ANDREWS; JOE S.
ANDREWS, d/b/a Andrews Dairy; PAT
ARD; BONNIE ARD; JAY BACOT and
LORI BACOT, d/b/a J & L Dairy; KEVIN
A. BAKER and DAVID FAZZIO, d/b/a
Green Acres Dairy; BRAD BEAN, d/b/a
Bean Holstein Farm; BURLEY C.
BEDWELL; DANIEL C. BENNETT, d/b/a
Bennett Dairy, Inc.; A.L. "SONNY"
BOYD and TANYA RUSHING, d/b/a B &
B Dairy farm; MARCUS B. BOYD, d/b/a
Marcus Boyd Dairy; BOB A. BRACEY
and Susan Bracey, d/b/a Harvey Acres;
JIMMY BROOKS; EARL H. BROWN,
d/b/a Brown Dairy;   DAVID BRUHL,
d/b/a J & D Dairy; CAROLYN
BULLOCK; BRIAN W. BURKE, d/b/a G
& B Dairy; WALLACE CARSON, d/b/a
Carson Dairy; JERRY F. CONERLY, JR.,
d/b/a Conerly Farms, Inc.; JERRY
CORKERN; CHESTER DILLON; PAUL
E. DILLON; TERRY WAYNE
DUNAWAY, d/b/a Terry Wayne Dunaway
Dairy; MICHAEL FERGUSON, d/b/a
Ferguson Farms; MALCOLM E. FORBES,
d/b/a Forbes Dairy, Inc.; CARROLL L.
FORTENBERRY; WILBURN
FORTINBERRY, III, d/b/a Fortinberry
Dairy; JAMES FREEMAN, d/b/a Freeman
Dairy; MICHAEL GLYNN, d/b/a GCC;
JOHN J. HALL III; RLH FARMS, INC.;
HELEN HOLMES, d/b/a Helen Holmes
Dairy; JOHNNY HOLMES, d/b/a Holmes
Dairy; KYLE S. JACKSON, d/b/a Jackson
Farm; MAX LAWSON; DONALD
LOWERY, d/b/a Lowery Brothers;
RANDY LOWERY, d/b/a Randy Lowery
Dairy; DAVID E. MAGEE, d/b/a Magee
Dairy Farm; JAMES E. MAGEE, d/b/a
Magee Farm; DICKEY MARTIN; LARRY

CASE NO.: 2:11cv97-KS-MTP

**SECOND AMENDED COMPLAINT**

**Jury Trial Demanded**

MARTIN, d/b/a L & M Dairy; KENNETH and JAMIE MAUTHE; BILLY McCULLOUGH;  RENEE McKENZIE, d/b/a Top Notch Farm; CHARLIE MILLER, CORA MAE MILLER and JAMES N. MILLER, d/b/a Miller & Sons' Dairy; QUINTIN MILLS DAIRY, INC.; DAVID G. NUNNERY, d/b/a Nunnery Dairy; BUFORD PIGOTT & SON, INC.; DOUGLAS POPWELL, d/b/a Popwell Dairy; JAMES POPWELL; WILLIE RAWLS AND JERRYE RAWLS, d/b/a Rawls Dairy; DAVID REGAN, d/b/a T & R Dairy; NEVILLE RIALS, d/b/a Rials Farms, Inc.; STEVEN ROWLEY, d/b/a Rowley Farms; JASON SHAW, d/b/a JLJ Dairy Farm; CHARLES SMITH, d/b/a Southland Dairy; PAUL D. SMITH, d/b/a Paul & Janice Smith Dairy; SPEAKS DAIRY, LLC; JAY STEWART; SHELTON Stogner; E. ALAN STRINGER, d/b/a Stringer dairy; ROBERT E. STRINGER and PATRICIA STRINGER, d/b/a Robert E. Stringer Dairy; TUCKER & SONS DAIRY, INC.; ANDY TURNAGE, d/b/a HL & Son, Inc.; KEITH TURNAGE, d/b/a Keith Turnage Dairy; MARK TYNES, d/b/a Mark Tynes Dairy; DONALD B. WACKER; SHANE WHITE; MICHAEL WILLIAMS, d/b/a Michael L. Williams Dairy; and JIMMY YARBOROUGH

Plaintiffs,

VS.

DAIRY FARMERS OF AMERICA, INC., SOUTHERN MARKETING AGENCY, INC., GARY HANMAN and JOHN AND JANE DOES 1-100.

Defendants.

2

**SECOND AMENDED COMPLAINT**

COMES NOW the Plaintiffs, by and through the undersigned counsel, and file this their Second Corrected Second Amended Complaint. Plaintiffs have conferred and obtained written consent of all Defendants pursuant to Fed. R. Civ. P. 15(a)(2) to correct this Complaint to reflect the Court's previous orders.

## NATURE OF THE ACTION

1.      American dairy farmers are the target of an illegal racketeering conspiracy that is driving this bedrock industry to the brink of collapse. Through an elaborate scheme of deceit and intimidation, Plaintiffs have been defrauded—indeed robbed—of their livelihoods by a tandem tag-team consisting of the largest national dairy cooperative and the country's biggest fluid milk processor.

2.      Created in 1998, Dairy Farmers of America (hereinafter "DFA") was established by merging several smaller cooperatives into one, mega co-op. Immediately after its inception, DFA

3.       officials began conspiring with Dean to maximize profits of the two organizations to the detriment of farmers. Defendants, over the next several years, acquired nearly all of the milk bottling and balancing plants in order to eliminate price competition in the Grade A raw milk market. DFA invested significant amounts of its members' monies into acquiring an interest in or ownership of these facilities.

4.      Although DFA alleges that its goal is to "help our members make their businesses

more profitable,[1]" owning stakes in these bottling plants brought DFA's interest in direct *conflict* with the farmers it was supposed to represent.  DFA was no longer focused on getting farmers the highest price for their milk; instead, the cooperative (and co-conspirators) sought to depress purchase prices in order to yield themselves higher profits.  What resulted may be the most lucrative, illicit commodity cartel in American history.

5.     In an unrestrained market, fluid Grade A milk bottlers compete amongst each other for the purchase of Grade A milk, thereby enabling farmers to obtain a price for their Grade A milk that would reflect actual market conditions.

6.     Pursuant to an unlawful agreement between Defendants, Dean would refuse to purchase all non-DFA members' milk thus granting the co-op an exclusive contract, and in return, DFA would gain exclusive supply contracts and control the farmers' pricing negotiations, keeping costs low and profits high for both entities.  These illegal contracts violated prior Department of Justice anti-monopoly conditions and essentially destroyed competition for Grade A milk.  With no competition, prices paid to dairy farmers has plummeted.

7.     In connection with this scheme to increase revenues through bottling facilities (which, upon information and belief, are not shared with member farmers), beginning in 1998 and continuing through the present, DFA management entered into numerous additional "sweetheart" deals with other co-conspirators, the details of which these officials concealed—and continue to conceal—from DFA farmer members.

8.     This case involves multiple illegal schemes of racketeering activity, including the

---

[1] http://www.dfamilk.com/our-cooperative (last visited March 10, 2011).

4

conspiracy to convert valuable profits from Plaintiff dairy farmers. Defendants were able to accomplish this by abusing the fiduciary relationship between DFA and its member farmers, then, once Defendants had obtained a large percentage of the processing market, they were able to extort the members into remaining with the co-op (and/or SMA and/or DMS). By that time, because of the Grade A milk monopoly, farmers had no other way to market their milk.

9.      Due to the highly perishable nature of Grade A milk, access to nearby bottling facilities is imperative to dairy farmers. In the Southeast, DFA, National Dairy Holdings (a DFA-owned organization) and Dean Foods are the top three largest milk bottling facility operators, together owning around 77% of the processing plants. Defendants, by acquiring a monopsony on processing plants, are then able to extort farmers into joining DFA where they must submit to the cartel's rules, prices and fees.

10.     Once the farmers are forced to join DFA, they are exploited to the utmost degree. With no competition, Defendants artificially reduced and fixed fluid raw milk prices paid to its members, thus yielding themselves higher profits.

11.     It was a beautiful picture for Defendants—DFA, as a co-op, is not legally required to disclose the details of financial transactions to its members. This concealment allowed DFA executives to convert millions in revenues, monies and assests that lawfully belong to DFA farmer members to themselves and outside business partners. For example, when DFA funded National Dairy Holdings in 2001, it had three individual partners: Allen Meyer, Tracy Noll and Cletes O. "Tex" Beshears. DFA invested $15 million, and the individuals invested $5 million a piece. When Noll and Beshears left the company a mere three years later, DFA bought them out at triple their initial investment.

12.     Although it is a cooperative, DFA is not required to give its members proceeds derived from its bottling operations and other outside business ventures, even though such ventures are financed, at least partially, by member farmers' proceeds and equity.

13.     In true racketeering fashion, those that have openly questioned the financial decisions have been threatened and/or ejected from the organization.  In order to preserve their monopoly, DFA and SMA have threatened and punished farmers who attempted to terminate their relationship with DFA or SMA, haulers who attempted to transport the milk of those farmers, and processors who attempted to purchase the milk of those farmers.

14.     The ongoing conspiracy between officers of DFA and Dean Foods has resulted in farmers being paid the lowest price for raw milk in 40 years, while both companies amass giant profits at the dairymen's expense.  These profits have been reinvested into its monopolization efforts and/or diverted to the officers and outside business partners.

15.     The result of Defendants' agreement not to compete for the purchase of Grade A milk, as described herein, has been to depress, stablize and fix prices paid by fluid Grade A milk bottlers in the Southeast to dairy farmers, and artificially lower the price received by those dairy farmers.

16.     In Mississippi alone, over 60% of dairy businesses have closed their doors since 1998 due to the Defendants' scheme to rob them of their profits; the rest are hanging on by a thread.  The small farm dairyman is on the verge of extinction.

17.     Plaintiffs bring a joint action pursuant to Federal Rule of Civil Procedure 20(a)(1)(A) and/or (B), under Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 & 2, the Racketeering Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962.  Additionally, Plaintiffs bring a claim of breach of contract.  For all of these, Defendants are jointly and severally liable.  This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs and expenses, as well as attorneys' fees and disbursements, punitive damages, along with such additional and further relief as may be deemed just and proper.

### JURISDICTION, VENUE AND INTERSTATE COMMERCE

18.     This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and the federal RICO Act, 18 U.S.C. § 1962.

19.     Subject matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.  This Court also has pendant jurisdiction over the Plaintiffs' state law claim.

20.     This Court has personal jurisdiction over Defendants as they systematically and continuously transact substantial business in the United States and in this District.

21.     Venue is proper in this district pursuant to 15 U.S.C. § 22 as this action contains Sherman Act claims, and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.  In addition, venue is proper in this district with respect to all Defendants.

22.     Defendants' business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce. Defendant DFA markets, processes and ships fluid Grade A milk across state lines.  Defendant SMA markets fluid Grade A milk across state lines.  All Defendants receive substantial payments across state lines from the sale of fluid Grade A milk.

## PARTIES

**Plaintiffs**

23.     Plaintiff Max Anderson is an adult resident citizen of Newton County, Mississippi, who operates Anderson Dairy at Decatur, Mississippi.

24.     Plaintiff Jesse L. Andrews is an adult resident citizen of Walthall County, Mississippi, residing at 583 Harveytown Road, Tylertown, Mississippi 39667.

25.     Plaintiff Joe S. Andrews is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Andrews Dairy at 5784 Harveytown Road, Tylertown, Mississippi 39667.

26.     Plaintiff Pat Ard is an adult resident citizen of Lincoln County, Mississippi, residing at 3479 Orchard Lane Southeast, Ruth, Mississippi 39662.

27.     Plaintiff Bonnie Ard is an adult resident citizen of Lincoln County, Mississippi, residing at 3479 Orchard Lane Southeast, Ruth, Mississippi 39662.

28.     Plaintiff Jay Bacot and Lori Bacot are adult resident citizens of Walthall County, Mississippi, residing at 130 Bacot Road, Tylertown, Mississippi 39667.

29.     Plaintiff Kevin A. Baker and David Fazzio are adult residents citizen of Harrison County, Mississippi, residing and doing business as Green Acres Dairy at 25119 Highway 53, Saucier, Mississippi 39574.

30.     Plaintiff Brad Bean is an adult resident citizen of Amite County, Mississippi, residing at 5630 Bean Road, Liberty, Mississippi 39645.

8

31.    Plaintiff Burley C. Bedwell is an adult resident citizen of Marion County, Mississippi, residing and operating his dairy at 123 Hurricane Creek Road, Sandy Hook, Mississippi 39478.

32.    Plaintiff Daniel C. Bennett is an adult resident citizen of Marion County, Mississippi, residing and operating Bennett Dairy, Inc., at 1173 Kokomo Road, Kokomo, Mississippi 39643.

33.    Plaintiffs A.L. "Sonny" Boyd and Tanya Rushing are adult resident citizens of Walthall County, Mississippi, residing and operating B & B Dairy Farm at 1443 Highway 583, Jayess, Mississippi 39641.

34.    Plaintiff Marcus Boyd is an adult resident citizen of Walthall County, Mississippi, residing and operating Marcus Boyd Dairy at 25 Alton Boyd Rd., Tylertown, Mississippi 39667.

35.    Plaintiff Bob Bracey and Susan Bracey are adult residents citizens of Walthall County, Mississippi operating Harvey Acres, residing at 199 Harveytown Rd., Tylertown, Mississippi 39667.

36.    Plaintiff Jimmy Brooks is an adult resident citizen of Walthall County, Mississippi, residing at 353 Simon Rd., Tylertown, Mississippi 39667.

37.    Plaintiff Earl Brown is an adult resident citizen of Lincoln County, Mississippi, residing and operating Brown Dairy at 2554 Sharpei Lane, Bogue Chitto, Mississippi 39629.

38.    Plaintiff David Bruhl is an adult resident citizen of Walthall County, Mississippi, residing and operating J & D Dairy at 128 Griffin Road, Tylertown, Mississippi 39667.

39.     Plaintiff Carolyn Bullock (widow of Charles Jerry Bullock) is an adult resident of Pike County, Mississippi, residing at 1047 Welsh Rd., McComb, Mississippi 39648.

40.     Plaintiff Brian W. Burke is an adult resident citizen of Lincoln County, Mississippi, residing and operating G & B Dairy at 4155 Primitive Dr., Ruth, Mississippi 39662.

41.     Plaintiff Wallace Carson is an adult resident citizen of Walthall County, Mississippi, residing and operating Carson Dairy at 3278 Highway 44, Columbia, Mississippi 39429.

42.     Plaintiff Jerry F. Conerly, Jr. is an adult resident citizen of Walthall County, Mississippi residing and operating Conerly Farms, Inc. at 255 Simon Rd., Tylertown, Mississippi, 39667.

43.     Plaintiff Jerry Corkern is an adult resident citizen of Leake County, Mississippi residing at 296 Grimes Road, Carthage, Mississippi 39051.

44.     Plaintiff Chester Dillon is an adult resident citizen of Walthall County, Mississippi, residing and operating his dairy operation at 186 Edgar Holmes Road, Tylertown, Mississippi 39667.

45.     Plaintiff Paul E. Dillon is an adult resident citizen of Walthall County, Mississippi, residing at 111 Beaver Dam Rd., Tylertown, Mississippi 39667.

46.     Plaintiff Terry Wayne Dunaway is an adult resident citizen of Lamar County, Mississippi, residing and doing business as Terry Wayne Dunaway Dairy at 92 J.C. Riley Road, Sumrall, Mississippi 39482.

47.     Plaintiff David Fazzio is an adult resident citizen of Harrison County, Mississippi, residing and operating Green Acres Dairy at 25119 Highway 53, Saucier, Mississippi 39574.

48.     Plaintiff Michael Ferguson is an adult resident citizen of Tate County, Mississippi, residing at 2707 Country Club Road, Senatobia, Mississippi 38668.

49.     Plaintiff Malcolm E. Forbes is an adult resident citizen of Marion County, Mississippi, residing and operating Forbes Dairy, Inc. at 123 John Ford Home Rd., Sandy Hook, Mississippi 39478.

50.     Plaintiff Carroll L. Fortenberry is an adult resident citizen of Pike County, Mississippi, who resides at 4088 Pike 93 South, Magnolia, Mississippi 39652.

51.     Plaintiff Wilburn Fortinberry, III, is an adult resident citizen of Pike County, Mississippi, residing and doing business as Fortinberry Dairy at 3076 Mt. Herman Road, Osyka, Mississippi 39657.

52.     Plaintiff James Freeman is an adult resident citizen of Pike County, Mississippi, residing and doing business as Freeman Dairy at 1168 Clem Nettles Road, Jayess, Mississippi 39641.

53.     Plaintiff Michael Glynn is an adult resident citizen of Marion County, Mississippi, residing and doing business as GCC at 8 Bennett Road, Kokomo, Mississippi 39643.

54.     Plaintiff John J. Hall, III, is an adult resident citizen of Pike County, Mississippi, residing and operating his dairy at 1070 meadow Hill road, Osyka, Mississippi 39657.

11

55.     Plaintiff RLH Farms, Inc., is a Mississippi corporation whose registered agent of process is Robert Hobgood, having its principal place of business at 299 Hobgood Road, Tylertown, Walthall County, Mississippi 39667.

56.     Plaintiff Helen B. Holmes is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Helen Holmes Day, 229 Log Cabin Road, Jayess, Mississippi 39641.

57.     Plaintiff Johnny Holmes is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Holmes Dairy at 283 Highway 84 East, Tylertown, Mississippi 39667.

58.     Plaintiff Kyle S. Jackson is an adult resident citizen of Copiah County, Mississippi, residing and doing business as Jackson Farm at 1164 Case Rd., Wesson, Mississippi 39191.

59.     Plaintiff Max Lawson is an adult resident citizen of Amite County, Mississippi, who resides at 7100 Highway 584, Osyka, Mississippi 39657.

60.     Plaintiff Donald Lowery is an adult resident citizen of Marion County, Mississippi, residing and doing business as Lowery Brothers, at 432 Lowery Loop, Foxworth, Mississippi 39483.

61.     Plaintiff Randy Lowery is an adult resident citizen of Lamar County, Mississippi, residing and doing business as Randy Lowery Dairy at 501 N. Slade Road, Sumrall, Mississippi 39482.

62.     Plaintiff David E. Magee is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Magee Dairy at 80 Harvey Dairy Rd., Tylertown, Mississippi, 39667.

12

63.     Plaintiff James E. Magee is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Magee Farm at 640 Fordsville Rd., Tylertown, Mississippi 39667.

64.     Plaintiff Dickie Martin is an adult resident citizen of Copiah County, Mississippi, residing at 3421 Heucks Retreat Road, Wesson, Mississippi 39191.

65.     Plaintiff Larry Martin is an adult resident citizen of Walthall County, Mississippi, residing and doing business as L & M Dairy at 704 Fordsville Road, Tylertown, Mississippi 39667.

66.     Plaintiffs Kenneth and Jamie Mauthe are adult resident citizens of Pike County, Mississippi, residing at 2033 Joe Tucker Rd., McComb, Mississippi, 39648.

67.     Plaintiff Billy McCullough is an adult resident citizen of Walthall County, Mississippi, residing at 87 Easley Fortenberry Rd., Tylertown, Mississippi 39667.

68.     Plaintiff Renee McKenzie is an adult resident citizen of Pike County, Mississippi, residing and doing business as Top Notch Farm, 1065 Fortenberry Road, McComb, Mississippi 39648.

69.     Plaintiffs Charlie, Cora Mae, and James N. Miller are adult resident citizens of Marion County, Mississippi, residing and doing business as Miller and Son's Diary at P.O. Box 94, Foxworth, Mississippi 39483.

70.     Plaintiff Quintin Mills Dairy, Inc., is a Mississippi corporation whose registered agent is Quintin Mills and whose office and principal place of business is located at 797 Hilsboro-Ludlow Road, Forest, Scott County, Mississippi 39074.

71.     Plaintiff David G. Nunnery is an adult resident citizen of Pike County, Mississippi, residing and doing business as Nunnery Dairy, 8075 River Road South, Summit, Mississippi 39666.

72.     Plaintiff Buford Pigott & Son, Inc., is a Mississippi corporation whose registered agent is Bill Pigott, having its principal office and place of business at 92 Pigott Easterling Road, Tylertown, Walthall County, Mississippi 39667.

73.     Plaintiff Douglas Popwell is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Popwell Dairy, 101 Popwell Road, Tylertown, Mississippi 39667.

74.     Plaintiff James Popwell is an adult resident citizen of Walthall County, Mississippi, residing at 45 Popwell Rd., Tylertown, Mississippi, 39667.

75.     Plaintiff Willie and Jerrye Rawls are adult resident citizens of Pike County, Mississippi, residing and doing business as Rawls Dairy at 1059 Oak Hill Drive, Magnolia, Mississippi 39652.

76.     Plaintiff David Regan is an adult resident citizen of Amite County, Mississippi, residing at 2296 River Road, Liberty, Mississippi 39645.

77.     Plaintiff Neville Rials is an adult resident citizen of Marion County, Mississippi, residing and doing business as Rials Farms, Inc., at 8 Bennett Road, Kokomo, Mississippi 39643.

78.     Plaintiff Steven Rowley is an adult resident citizen of Marion County, Mississippi, residing and doing business as Rowley Farms, Inc. at 313 Rowley Rd., Foxworth, Mississippi 39483.

79.    Plaintiff Jason Shaw is an adult resident citizen of Stone County, Mississippi, residing and doing business as JLJ Dairy Farm, 31271 Crane Creek Road, Perkinston, Mississippi 39573.

80.    Plaintiff Charles Smith is an adult resident citizen of Walthall County, Mississippi residing and doing business as Southland Dairy, at P.O. Box 137, Tylertown, Mississippi, 39667.

81.    Plaintiff Paul D. Smith is an adult resident citizen of Pike County, Mississippi, residing and doing business as Paul & Janice Smith Dairy at 1135 Rawls Rd., Osyka, Mississippi, 39657.

82.    Plaintiff Speaks Dairy, LLC, is a Mississippi limited liability company whose manager is James R. Speaks, and whose principal office and place of business is at 14 Speaks Lane, Jayess, Walthall County, Mississippi 39641.

83.    Plaintiff Jay Stewart is an adult resident citizen of Walthall County, Mississippi, residing at 370 Knoxo Rd., Tylertown, Mississippi 39667.

84.    Plaintiff Shelton Stogner is an adult resident citizen of Walthall County, Mississippi, residing at 358 Flowers Road, Tylertown, Mississippi.

85.    Plaintiff E. Alan Stringer is an adult resident citizen of Marion County, Mississippi, residing and doing business as Stringer Dairy at 373 Pickwick Road, Foxworth, Mississippi 39483.

86.    Plaintiff Robert E. Stringer and Patricia Stringer are adult resident citizens of Marion County, Mississippi, residing and doing business as Robert E. Stringer Dairy at 191 Stogner Road, Foxworth, Mississippi 39483.

87.     Plaintiff Tucker & Sons Dairy, Inc., is a Mississippi corporation whose registered agent for process is James H. Tucker, Jr., and whose principal office and place of business is located at 8010 McComb-Holmesville Road, McComb, Pike County, Mississippi 39648.

88.     Plaintiff Andy Turnage is an adult resident citizen of Marion County, Mississippi, residing and doing business as HL & Son, Inc., at 255 White Road, Foxworth, Mississippi 39483.

89.     Plaintiff Keith Turnage is an adult resident citizen of Marion County, Mississippi, residing and doing business as Keith Turnage Dairy at 215 Turnage Chapel Road, Foxworth, Mississippi 39483.

90.     Plaintiff Mark Tynes is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Mark Tynes Dairy at 321 E. Sartinville Road, Jayess, Mississippi 39641.

91.     Plaintiff Donald B. Wacker is an adult resident citizen of Walthall County, Mississippi, residing at 2181 Clem Nettles Rd., Jayess, Mississippi 39641.

92.     Plaintiff Shane White is an adult resident citizen of Lincoln County, Mississippi, who resides at 1580 Wellman Drive, Brookhaven, Mississippi 39601.

93.     Plaintiff Michael Williams is an adult resident citizen of Marion County, Mississippi, residing and doing business as Michael L. Williams Dairy, at 120 Monroe Kennedy Road, Sandy Hook, Mississippi 39478.

94.     Plaintiff Jimmy R. Yarborough is an adult resident citizen of Walthall County, Mississippi, residing and doing business as Yarborough Dairy at 712 Highway 585, Tylertown, Mississippi, 39667.

16

**Defendants**

95.    Defendant DFA is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Southeast Council headquarters located at 10411 Cogdill Road, Knoxville, Tennessee 37932.  DFA controls approximately 90% of the Grade A milk produced in the Southeast.  It is a vertically integrated cooperative that controls raw-milk production and owns and operates its own hauling companies, processing plants, and distribution centers for processed milk.

96.    Defendant Southern Marketing Agency, Inc. is a non-profit corporation organized and existing under the laws of Kentucky with its principal place of business at 13002 Honeysuckle Way, Prospect, Kentucky 40059.  SMA is an entity created and controlled by DFA in order to further its conspiracy with Dean Foods to illegally control the Grade A milk market in order seven.  Dean and DFA use SMA to monitor prices paid to independent farmers and other cooperatives in these regions in order to fix prices paid to these providers.

a.    Originally formed in 2002, Southern Marketing's current members include Dairy Farmers of America, Maryland and Virginia Milk Producers, Lone Star Milk Producers, Dairymen's Marketing Cooperative, and Arkansas Dairy Cooperative Association.

b.    DFA is the largest member of Southern Marketing.

97.    Defendant Gary Hanman, an individual, was DFA's Chief Executive Officer from its formation in 1998 until he retired from that position on December 31, 2005.  Hanman also served on the management committee of Dairy Management LLC, the sole general partner of NDH.  Hanman has participated in, authorized, directed, and/or knowingly approved or ratified the illegal conduct alleged herein.  Upon information and belief,

17

Hanman continues to participate in the activities of DFA.

98.     The named Defendants have been assisted by numerous but currently unknown persons in their unlawful conduct; these persons include, but are not limited to, other corporate and/or individual co-conspirators, including various directors, officers or agents of the named Defendants, along with their respective corporate entities.  These unknown persons may be joined to this litigation as named parties when the Plaintiffs know their identities. The identities of these unknown defendants will be revealed in discovery and are referenced herein as John Does 1-100.

99.     This action is brought pursuant to Fed.R.Civ.P. 20(a)(1)(A) and (B) in that the Plaintiffs join in one action because they seek relief jointly and severally or, in the alternative, their claims arise out of the same transactions, occurrences or series of transactions or occurrences, and there are predominant questions of law and fact common to all Plaintiffs and Defendants that will arise in this action.

## FACTUAL ALLEGATIONS

### A. Overview of the Relevant Markets

100.    Grade A raw milk is top quality milk produced by dairy farmers.  It is highly perishable and must be immediately transported from the farm to a bottling facility where it is sold to processors and bottling companies.  These companies process the liquid into beverages which are eventually sold to the public through grocers, schools or other retail outlets.  The relevant market for purposes of this Complaint is liquid Grade A milk which has been extracted by Plaintiff dairy farmers for use in beverages only.

101.    Minimum blend prices for raw milk are set monthly by USDA milk price administrators.  Under the 1937 Agriculture Act, Grade A milk is divided into four

18

categories for minimum pricing purposes, depending on its end use:

    a. Class I: used in beverage products for human consumption

    b. Class II: used to manufacture "soft" dairy products such as sour cream, cottage cheese and ice cream.

    c. Class III: used to manufacture hard dairy products such as cheddar cheese.

    d. Class IV: used in butter and dry milk.

102. Minimum pricing takes into account the end product of the milk and the geographic region.

103. The United States milk industry is divided up into ten geographic sections known as "Federal Milk Market Orders" or "FMMOs." This Complaint is focused on raw, fluid Class I Grade A milk in FMMO seven, encompassing the Southeastern states of Mississippi, Arkansas, Alabama and Louisiana, along with parts of Florida, Georgia, Kentucky, Missouri and Tennessee.

104. Because milk order seven has a high demand for Class I, liquid milk, these orders also yield large profits for processors who can sell the milk at top prices to retailers. Likewise, because most of their milk is used as liquid beverages, dairy farmers in this FMMO are supposed to have some of the highest minimum purchase prices.

105. While bottlers are required by law to pay the cooperative federal minimum prices, cooperatives are not required to return the full amount to their members.

106. Before the inception of mega-cooperative DFA, the smaller co-ops negotiated prices for their farmers above the USDA minimums to more accurately reflect market conditions. These overages, called "over-order premiums," essentially were the dairy farmers' profits. The actual price the farmers recieve is called the "mailbox price." It is composed of the federal minimum price plus any negotiated over-order premiums. Prior

to Defendants' conspiracy to monopolize the bottling industry and defraud the farmers out of their profits, Plaintiff farmers received substantial over-order premiums, which were crucial for their continued operation.

### B. Milk Cooperatives

107.    Dairy Cooperatives are associations of dairy farmers who collectively market their raw milk and other dairy products.  They are supposed to be "voluntary associations" that are owned, operated, and controlled by their member farmers.

108.    Traditionally, co-ops marketed their farmers raw milk by locating buyers, negotiating high sales prices, coordinating hauling, performing testing, recording and reporting data to market regulators and paying member farmers for the sale of their milk. The Capper-Volstead Act permits cooperatives to operate without regard to certain antitrust laws.  This case alleges conduct that is outside the scope of the Act's protections.

109.    In the late 1960's, numerous small cooperatives began merging into fewer larger co-ops.  In the mid 1970's, the Department of Justice (hereinafter "DOJ") filed antitrust actions against three cooperatives for violations of Sections 1 and 2 of the Sherman Act, alleging that the cooperatives entered into contracts, agreements and understandings in an attempt to monopolize trade and commerce in the raw milk market.

110.    In 1998, DFA was formed by the merger of four of the largest cooperatives, including two of those co-ops sued by the DOJ: Associated Milk Producers, Inc. and Mid—America Dairymen, Inc.  DFA was the brainchild of former CEO Gary Hannman, who was instrumental in its initial inception.

111.    Since then, three additional co-ops have been encompassed by DFA, making it the

largest dairy cooperative in the United States.  It controls more than 50 percent of the raw Grade A milk produced in the Southeast.

## C.  The Monopoly/Monopsony Conspiracy

112.    In 2001, Dean Foods was the second-largest buyer of raw milk and the second largest bottler of processed milk in the United States.  The largest was Suiza Foods Corp. (hereinafter "Suiza"), a company owning 67 dairy processing plants in 29 states.  DFA owned 33.8% stake in Suiza.  In 2001, Dean decided to merge with Suiza and buy out DFA's interest in the company.

113.    As early as February, 2001, Suiza's directors had detailed discussions about the antitrust implications of the proposed merger.  Engles, Chairman of the Suiza Board of Directors and Chief Executive Officer of Suiza, who would later become Chairman of the Board and Chief Executive Officer of Dean, led the discussion and was integral to divising the strategy to skirt the Department of Justice's imminent concerns.  The discussions about antitrust implications of the merger continued in both Special Meetings of the Suiza Board of Directors and during the usual meetings of the Suiza Board of Directors throughout the year.

114.    As a result of these meetings, Dean and Suiza schemed to "divest" eleven milk bottling plants to an "independent competitor."

115.    DFA was the perfect choice for a straw competitor; the cooperative's CEO was ambitious and sought market domination.  Dean, with its newly acquired Suiza facilities, could make this happen.  With DFA posing as a competitor, the two entities would have total control of the fluid milk market.  Most importantly, through DFA, Dean would be able to eliminate the bargaining power of the dairy farmers, an act which would bring

additional profits to the bottling facilities.

116.    Using farmer-derived income and/or equity, DFA created a separate corporation known as National Dairy Holdings (hereinafter "NDH") to purchase and operate these eleven processing plants so that the Dean/Suiza merger could proceed without intervention.  In connection with Dean's agreement to acquire DFA's interest in Suiza, Dean signed a $40 million promissory note to DFA which becomes due in 2021 in the amount of $96 million.

117.    This newly formed partnership called NDH was made up of DFA and two former Dean executives.  DFA used its control over NDH[2] to ensure that NDH would not vigorously compete with Dean.

118.    Indeed, Allen Meyer, who had made millions with DFA over the years, was an initial individual investor in NDH and, upon information and belief, remains Chairman and CEO of the company today.

119.    Upon information and belief, DFA, to date, has provided more than $400 million dollars in financing to NDH[3], enabling it to operate these 11 plants, along with the abilty to purchase other bottling facilties.

120.    For its part, Dean agreed to reverse its historical practice of purchasing raw milk

---

[2] At all times relevant to this Complaint, DFA has owned at least 50 percent of NDH's equity and voting shares.  In 2007,  DFA purchased an additional 37.5%, giving it a total ownership interest of 87.5%.  DFA also has a 50% interest in Dairy Management LLC, which is the managing arm of NDH.  Based on its financial interests in NDH, DFA has the rights to between 50-75% or more of NDH's profits.  In forming NDH, DFA and its partners agreed, among other things, that DFA must approve any decision to commit NDH to any contracts or expenditures exceeding $50,000, to appoint new NDH officers, or to change the compensation of NDH's officers.  As a result, NDH does not take any significant action without DFA's express approval or without having been directed to take action by DFA.

[3] A portion of this financing was derived from Defendant Mid-Am, a subsidiary of DFA.

22

from independent farmers (from which it had been purchasing hundreds of millions of pounds of milk at more favorable prices), and to enter into full-supply agreements with DFA. Dean also agreed to use DMS, an entity controlled by DFA, to purchase the raw milk needed to run its milk bottling plants.

121.    In 2003, pursuant to Defendants' conspiracy, Dean assigned its marketing agreements with its remaining independent dairy farmers to DMS. No Defendent informed these independent dairy farmers that their fluid, Grade A milk would thereafter be marketed, processed, and controlled by DFA; nor were they informed that DFA would process the payment for the fluid, Grade A milk, or that prices paid to DMS producers were fixed, suppressed, and stablized by Defendants and co-conspirators.

122.    As part of Defendants' conspiracy, Dean and NDH entered into exclusive, full-supply contracts with DFA for Grade A milk. At the time, both Dean and NDH knew that DFA did not have sufficient local milk production of its own to satisfy the Dean full-supply agreement, much less both the Dean and NDH full-supply agreements.

123.    As a bottler, entering into such an agreement with the knowledge that DFA could not meet this demand would have been contrary to the best interest of both Dean and NDH. However, because of Defendants' conspiracy to monopolize/monopsonize the fluid Grade A milk market in this region, Defendants were aware that after the full supply agreements went into effect, all independent dairy farmers would have no choice but to join DFA, thereby enabling DFA to fulfill the production needs of Dean and NDH.

124.    DFA's full-supply agreement with Dean, which consists of a series of 20 successive one-year agreements, grants DFA the exclusive right to supply the Grade A milk requirements of Dean's fluid milk bottling plants in the Southeast.

125. Dean and DFA entered into these full-supply agreements, despite a DOJ consent decree prohibiting DFA from entering into supply agreements in excess of one year.

126. Dean and DFA ensured that their full-supply agreement would be long-term by DFA agreeing to forgive the entire balance of the promissory note provided that Dean renews each of the 20 full-supply agreements. Additionally, Dean agreed to pay liquidated damages of up to $96 million in the event that it fails to renew each of the 20 full-supply agreements.

127. Defendants, along with their co-conspirators, collectively conspired to suppress and restrain competition in interstate commerce of Grade A milk produced, processed and marketed in the Southeast. Their full-supply agreements enabled them to unlawfully force other independent cooperatives or farmers, needed to fulfill these agreements, to join DFA or market their Grade A milk through DFA controlled entities such as SMA or DMS in order to have access to bottling plants in the Southeast.

128. According to an SMA official, SMA was formed to control 100% of the milk and to eliminate the independent option for southeast dairy farmers.

129. Specifically as illustration, in late 2001 and 2002, Dean and DFA informed Maryland and Virgina Coop, a previously independent dairy cooperative, that Dean's Grade A milk bottling plants would no longer accept their milk unless they joined SMA. Neither Dean nor DFA informed the co-op that it would lose the right to negotiate its price with Dean and NDH on behalf of its members or that DFA would flood the market with Southwest milk, further reducing the prices paid to members of the Maryland and Virginia Coop.

130. Upon information and belief, substantially similar threats with similar results

24

were made to Arkansas Dairy Cooperative Association, Inc. and Dairyman's Marketing Cooperative, Inc., small cooperatives that operate in the Southeast.  The boards of these previously independent cooperatives felt that they had no choice but to join SMA in order to maintain access to Grade A bottling facilities in the Southeast.  Because DFA controls access to fluid Grade A milk bottlers in the Southeast and is the controlling member of SMA, DFA member dairy farmers likewise have no choice but to pay inappropriate fees and charges for the "services" provided by SMA.

131.    The conspiracy, which put DFA on the bottling side of production, placed its interests in direct conflict with the farmers it was supposed to represent and protect.  DFA abused its fiduciary relationship and still fraudulently represents that it seeks the highest raw milk prices for its farmers[4]; however, due to the unlawful conspiracy, it actually aims to give farmers the lowest price in order to yield its outside business deals and joint ventures (along with co-conspirator Dean) higher profits.

132.    Upon information and belief, despite these agreements and the full-supply agreement, DFA and Dean occassionally permit some "independent" dairy farmers to deliver fluid Grade A milk directly to Dean's fluid bottling plants, but only at prices set pursuant to Defendant's conspiracy.  Although a few independent dairy farmers have gained access to Dean directly, they are not permitted to negotiate price, but must instead accept the price fixed by Defendants' cartel.

133.    Ernest Yates, Dean's former milk procurement manager, admitted that Dean, DFA and DMS jointly set prices paid to "independent" milk producers selling to Dean.

134.    John Collins, the former DFA Chief operating officer for the Southeast, also

---

[4] DFA's stated purpose is "to ensure the dairy industry is successful" and to "make our members businesses more profitable."  This could not be further from the truth.

admitted that DFA communicated with Dean and the co-conspirators together reached a "consensus" on the over-order prices to be set.

135.    Defendant Meyer, current and former NDH official, also admitted that NDH would not agree to a price unless DFA confirmed that Dean and other processors had agreed to the same price.

136.    Defendant Hanman admitted that he and Pete Schenkel, Dean's former dairy group president, talked nearly every Saturday for ten years regarding topics such as future milk prices and consolidation.

137.    Dean, DFA and DMS regularly exchanged detailed price reports, which included internal milk procurement cost information.

138.    The result of Defendants' agreement to refuse to compete for the purchase of fluid, Grade A milk, as described herein, has been to fix, stablize and maintain the over-order premium paid by fluid Grade A milk bottlers to Southeast dairy farmers, and to lower the mailbox price received by those dairy farmers to an amount often below the FMMO minimum price.

## D. The Extortion of Dairy Farmers

139.    Milk, especially Grade A liquid milk, is extremely perishable and the cost of transporting it is extremely high.  As a result of these economic realities, processed milk markets are regional in scope.  Indeed, a leading dairy publication has concluded that a milk bottler does not need to achieve a large share of the national market to exercise monopoly power; it only needs a large share of the relevant regional market.

140.    Essentially all of the bottling facilities in Southeast, FMMO seven, are owned by NDH, DFA and/or Dean.  Dean currently operates 17 processed milk bottling plants in

26

the Southeast, and upon information and belief, controls at least 60% of the processed milk bottling capacity in this area, making it the largest processed milk bottler in the region. NDH currently owns eight bottling plants in the Southeast, and, upon information and belief, is the second largest bottler in this region. Even after divesting its stake in Suiza to Dean, DFA has continued to maintain substantial interests in milk bottling through a series of joint ventures. Through those joint ventures, DFA fully or partially owns at least eight bottling plants (not including NDH) in the Southeast, and upon information and belief, is the third largest processed bottler in this area.

141.    Although DFA technically must pay the federal minimum prices to its farmers, it is not required to give its members a share of profits obtained from processing operations and other joint ventures. Indeed, members of DFA are not informed, nor can they obtain information regarding these profits or how they are distributed. They likewise are uninformed about how much their executives are paid.

142.    Over the years, DFA's managment has entered into various sweetheart deals with outside businessmen to the detriment of its member farmers. DFA's expansion into Grade A milk processing enabled its mangement to engage in a scheme to divert millions of dollars, the details of which DFA managment has refused to disclose to DFA member famers.

143.    Hanman was assisted in this scheme by co-conspirators, including Allen, Brubaker, Engels, Meyer and others. (Allen was an executive with Borden Inc., which DFA acquired in 1998, is an "advisor" to DFA's Board of Directors, and with NDH jointly-owned Southern Belle, a fluid Grade-A milk bottler in the Southeast; Engles is Dean's Chief Executive Officer and Chairman of the Board and he previously served as

Suiza's Chief Executive Officer and Chairman of the Board until Dean and Suiza merged in 2001).

144.    DFA, under the control of Hanman, purchased processors or other ventures from Allen, Baird, Meyer and others for grossly inflated prices, or sold its processors or other business ventures to Allen, Baird, Meyer and others for unreasonably deflated prices. Upon information and belief, these deals include, among others, the following transactions:

    a.  When Mid-Am, DFA's predecessor, directed and controlled by Hanman, attempted to acquire Borden in 1997, Allen formed Milk Products, LLC- which a Mid-Am subsidiary financed with a guaranteed 30 million dollar loan- to purchase Borden's assets in Texas, Louisiana and New Mexico to remedy the DOJ's antitrust concerns.  Upon information and belief, in 2001, Allen sold Milk Products, LLC to NDH for a price substantially above fair market value, and he reaped a multimillion dollar profit from his risk-free venture with DFA and NDH.  In these transactions, upon information and belief, the Mid-Am subsidiary unnecessarily loaned Allen 30 million dollars and sold the divested assets to Allen at substantially less than fair market value.

    b.  In 1998, businessman Allen Meyer and DFA sold a combined Land-O- Sun and Flav-O-Rich dairy company.  Meyer made 70 million off of an initial investment of several hundred thousand.

    c.  In 2001, DFA, Meyer, and two other individuals formed NDH.  Meyer and the two individuals each contributed $5 million for the same ownership stakes in NDH.  Three years later, DFA purchased the other two individuals ownership stakes in NDH for a total of $41 million dollars, or more than four times their initial investment, which, upon information and belief, was not a fair market value transaction.

    d.  In February 2002, DFA and businessman Robert Allen acquired the Southern Belle processing facility for $18.7 million, with Allen's family trust putting up $1 million and DFA supplying the remaining $17.7 million.  Notwithstanding the inequities of finanincing, each party was granted 50% voting shares.  Allen was later granted 100% voting shares to allay antitrust concerns.  DFA guaranteed Allen could recoup his investment within three years, and he obtained the right to 50% of the increase in the value of the firm.

145.    In a lawsuit filed against DFA by the Department of Justice in 2003, the government stated that "[l]ike Allen at Southern Belle, Meyer enjoys a share of the profits and potential appreciation that is far out of proportion to his investment in NDH/Flav-O-Rich, thanks to DFA . . . the prospect of future ventures with DFA affords Meyer a strong incentive to manage [NDH dairy] Flav-O-Rich in a manner that serves DFA's interests in eliminating competition with Southern Belle."

146.    In 2008, DFA members learned of a $1 million dollar NDH check, written to DFA board member Herman Brubaker by the wife of Allen Meyer.  Member farmers were never told why the transfer occurred, nor were the offending parties ever prosecuted.

147.    During the relevant time period, Dean, NDH and DFA[5] have continued to purchase processing plants for the purpose of solidifying their dominance over milk in the Southeast market and have bought and closed-down and/or refused to operate facilities in order to decrease capacity and limit farmer access.  During the relevant time period, the co-conspirators own 33 bottling facilities which, upon information and belief, represents 77% of the processed milk bottling capacity in the Southeast.  Nine of the remaining bottling plants in the Southeast are owned by retail supermarket chains which typically do not sell processed milk to competing retailers and many of the nine other bottling plants are small and do not take new farmers.

148.    Additionally, the co-conspirators also control most of the balancing plants in the Southeast.  Typically, Grade A milk balancing plants are used to hold milk during weekends or holidays when the bottling plants are closed, and convert bulk supplies of

---

[5] DFA owns several processing facilities through its subsidiary, Mid-Am.

surplus Grade A milk into storable products such as cheese and powdered milk. Balancing plants are essential due to weekly and seasonal variations in Grade A supply and demand. It would be impossible for a dairy farmer to continue business without access to the balancing plants controlled by Defendants.

149.    In order to quash the dairy farmers' negotiating ability and competition, none of the facilities will process a farmer's milk unless he or she is a paying member of DFA and/or markets their milk through SMA or DMS.

150.    Because of the monopoly/monopsony situation, Southeast dairy farmers have no choice but to process their milk at a facility owned and/or operated by either Dean, DFA or NDH.

151.    As a result of the illicit agreement between Defendants, DFA has been able to extort previously independent farmers and other independent milk co-ops into joining either DFA or the DFA-controlled SMA/DMS, thus further aiding DFA's efforts to monopolize the market for the sale of raw milk to bottlers in the relevant portions of the United States. As a result, DFA controls, upon information and belief, approximately 90% of the Grade A raw milk produced in the Southeast.

152.    Because DFA-controlled marketing entities such as SMA or DMS and other co-conspriators market nearly all of the Grade A milk produced and processed in FMMOs seven, the co-conspirators are able to monitor the prices paid to all dairy farmers in this area. This information is used to fix and stablize over-order premiums at lower levels than what would have prevailed in a competitive market.

153.    Both Dean and DFA have agreed to use SMA manager James Baird's hauling company, BullsEye, to haul milk from the Southwest to Southeast and within the

Southeast.  Upon information and belief, BullsEye charges excessive shipping charges much higher than other haulers due to the fact that Baird transports unnecessarily large quantities of Grade A milk for SMA from the Southwest to the Southeast, and also transports Grade A milk unnecessarily long distances for SMA within the Southeast.

154.    The co-conspirators benefit several ways from these actions.  By flooding the Southeast market with outside Grade A milk, SMA reduces the mailbox prices Southeast farmers receive, thus lowering the cost to Dean and NDH.  SMA manager James Baird is paid these excessive fees from SMA member farmers, which further supressess the mailbox prices non-DFA farmers receive in their milk checks.  Finally, upon information and belief, in return for using BullsEye, Baird informs SMA who in turn informs Dean and DFA regarding the amounts, destination and origins of all other milk shipped in the Southeast.

155.    Through the marketing entities, Defendants created a mechanism by which each could exchange and monitor price information and thereby monitor compliance with their conspiracy to fix, depress, and stablize prices paid to diary farmers.  This jointly enforced price-monitoring mechanism ensures that Defendants can operate comfortably with the knowledge that it will not have competition on price for Grade A milk.

156.    Defendant Hanman was personally paid millions of dollars in bonuses for increasing DFA's market share.  DFA and DMS's senior executive compensation plans also included bonuses based upon managments' success at paying DFA and DMS producers the same price, thereby ensuring that independent farmers received no more than DFA farmers for their milk.

157.    At all times relevant to the Complaint, Defendants have employed common

employees who enable Defendants to monitor and enforce compliance with their conspiracy.

158.    For example in the sale of NDH to Groupo LALA in May of 2009, DFA was able to retain Chairman and CEO Allen Meyer's position with the "competitor" company. Meyer's extreme loyalty to DFA, born out of prior prosperous business dealings, was clearly outlined in a 2003 antitrust lawsuit filed by the Department of Justice.  The government's expert, when asked about the likelihood that Meyer would actively compete with DFA, responded that Meyer has "a strong incentive to manage NDH/Flav-O-Rich and Southern Belle in a manner that furthers DFA's interest in suppressing competition.  DFA, Allen and Meyer all profit from the elimination of competition between NDH and Southern Belle."

159.    As a direct and proximate result of the conspiracy, Plaintiffs have been injured and have sustained damages in that the prices of Grade A milk have been artificially reduced below levels they would have received but for Defendants' unlawful agreement to refuse to compete for the purchase of raw milk.  Dean, NDH and DFA have purchased many billions of pounds of Grade A milk at these artifically depressed prices.  As a result of the conspiracy, Defendants and Co-conspirators have converted many hundreds of millions of dollars in profits that would have rightfully been paid to Plaintiffs for their Grade A milk.

160.    Additionally, as a result of the conspiracy, Plaintiffs were forced into joining and/or remaining members of DFA and to pay exorbant fees and costs.

161.    Because they control the Grade A milk market and have saddled their Southeast member farmers with full-supply agreements they cannot fulfill, DFA is able to bring in

and "pool" outside, cheaper milk from other FMMOs into FMMO seven and charge the farmers for transportation costs.

162.    This further reduces the price paid to farmers in order seven.  Due to their ability to extort the farmers into paying whatever fees DFA decides to assess them for, DFA can, and does, deduct the costs of transporting this outside milk from farmers' milk checks.

163.    In August of 2006, U.S. Milk, a newly-formed Southeast organization consisting of independent farmers and other co-ops, contacted Dean Foods about discussing a supply agreement.  Due to the conspiracy to monopolize/monopsonize the market with DFA, Dean refused to even discuss the possibility with U.S. Milk.

164.    While deductions and fees from member farmers' have been and are used to fund joint ventures and other outside business deals,  upon information and belief, profits from these deals are not shared with the farmers.

165.    Any losses from these outside ventures, however, are routinely incorporated and deducted from members' milk checks and equity.

166.    Defendants' actions had the purpose and effect of depressing these over-order premiums paid to Plaintiff dairy farmers, and virtually eliminated competition which would have resulted in higher prices.

167.    Those dairymen who are brave enough to ask questions are met with intimidation and/or exclusion from the processing facilities.  Defendants have joinly sought to punish, exclude, and/or discipline the few remaining independent Grade A milk bottlers, haulers and farmers that have resisted complying with Defendants' conspiracy or who have attempted to compete with Defendants in the Southeast.  These acts by Defendants damage all dairy farmers by eliminating all sources of competition for Grade A milk.

168.    As Plaintiffs have no choice but to submit to DFA's demands, Defendants are able to extort them into paying other outrageous fees.

169.    The Defendants' illegal scheme to defraud the Southeastern dairymen in milk order seven is but one example of the Defendants common practice of exploiting dairy farmers through criminal fraud and extortion.

### E.  Concealment and Tolling

170.    Throughout the relevant period, Defendants have actively and affirmately concealed from Plaintiffs the unlawful combination, conspiracy, and agreement among Defendants as alleged herein.  Upon information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy through non-public meetings, agreed not to discuss and to conceal the details of their conspiracy, and at all times falsely represented to Plaintiffs that they were receiving fair and competitive prices for their Grade A milk.

171.    Former regional board members of DFA have stated that even they were uninformed regarding the Dean/DFA conspiracy.  Member farmers who asked questions were either lied to or threatened with expulsion (which would prohibit access to the dairy processing facilities needed to survive in the industry).

172.    For example, in 1996 Carol Knight was elected to the board of DFA's predessor Mid-America Dairymen (led by future DFA Cheif Executive Gary Hanman).  She and her fellow Louisiana dairy farmers were suspicious of the cooperatives financial activities and wanted answers.  Once installed on the local board, Knight began asking questions about unexplained deductions from members' milk checks.

173.    After only two meetings, the co-op canceled Knight's membership mid-term.

With no where to go to process her milk, Knight was without a market. She was forced to sell her cows and find other work. Knight and her husband sued Mid-America Dairymen and won a judgment for $600,000.

174.   Other dairymen that asked questions or published articles critical of the co-op were threatened with "The Carol Knight Treatment."

175.   In August of 2005, four angry farmers--Donna Hall, Hal Drick, Gordon Wood and Bill Hart--appeared on CNN complaining about how they had been forced to join DMS to the detriment of their finances. For their September milk checks, three of the four had identical, unduly low butter fat tests—all at an identical 3.43%. The farmers researched these tests through the Pennsylvania agriculture department and found that all three had been hand-entered by DMS personnel, a feat that required overriding the automatic, computer-generated milk testing system.

176.   Additionally, in furtherance of the conspiracy, DFA continuously misleads farmers about its loyalty via mailings such as "newsletters" and wirings such as email updates, thus actively concealing its actual goals and the corrupt agreement.

177.   In publically-filed answers in other antitrust complaints beginning in 2007, both DFA and DMS denied that DFA controls DMS.

178.   In March 2009, DFA's President and CEO Rick Smith publicly stated at the DFA's annual meeting that low milk prices were a result of "world supply and demand. We were expanding production into a growing export market."

179.   In September 2009, Dean issued a public statement saying that "[t]o suggest that we control the raw-milk market, or that we are the cause of low milk prices, makes no sense. For most of the milk we buy, we pay a price that is regulated by USDA, plus

premiums."

180.    Not only did Defendants assure the farmers and public that milk prices were a result of market conditions, they went one step further and indicted that their business activities had frequently been reviewed and approved by Government officials.

181.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, which they exercised, the unlawful conduct alleged herein at the time it occurred.

182.    Indeed, Defendants are actively attempting to conceal their conduct even today. An email from Dean spokesperson Liliana Esposito was sent on February 21, 2011 to the Dairyherd Network in response to the antitrust lawsuits filed in Tennessee.  Esposito claimed that industry competition was "alive and flourishing" and stated that Dean believes that "farmers have many outlets for their raw milk at competitive prices."

**COUNT ONE**
**SHERMAN ACT SECTION 2 VIOLATION**
**Conspiracy to Monopolize and Monopsonize**
**(Against ALL Defendants)**

183.    Plaintiffs incorporate by reference paragraphs 1 through 182 as if fully alleged herein.

184.    At all times relevant to this Complaint, Defendants have willfully, knowingly and intentionally conspired among themselves with specific intent to monopolize the market for the marketing or sales of fluid Grade A milk to bottling plants in the Southeast, to monopsonize the market for the purchase of fluid Grade A milk by bottling in the Southeast, and thereby to depress, fix and stabilize the over-order premiums paid for Grade A milk produced in the Southeast and to ensure that all dairy farmers of such milk would be unable to market their fluid Grade A milk except at prices that were fixed and

artificially depressed by Defendants conspiracy.  This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

185.    In furtherance of the conspiracy, Defendants have committed one or more of the following overt acts: a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Dean, NDH, Defendant DFA and their Co-conspirators to control Southeast Dairy farmers access to fluid Grade A milk bottling plants; b) artificially depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor price for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

37

186.   The relevant geographic market is the Southeast United States, specifically FMMO 7.  Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.  Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast.  Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

187.   The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (i.e., sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (i.e., buy-side).  The market for the sales of marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

188.   Defendants willfully conspired among themselves with the intent to acquire, maintain and exploit monopoly power in the market for the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Southeast, and Defendants

38

willfully conspired among themselves with the intent to acquire, maintain and exploit monopsony power in the market for the purchase of fluid Grade A milk by Fluid Grade A milk bottling plants in the Southeast.

189. As a direct and proximate result of Defendants continuing violation of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

190. Plaintiffs seek money damages from Defendants jointly and severally for these violations. Such damages represent the additional amount Plaintiffs would have received for sales of Grade A milk in the absence of the violations alleged. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

191. Plaintiffs also seek injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT TWO**
**SHERMAN ACT SECTION 2 VIOLATION**
**Attempt to Monopolize and Monopsonize**
**(Against ALL Defendants)**

192. Plaintiffs incorporate by reference paragraphs 1 through 191 as if fully alleged herein.

193. The relevant geographic market is the Southeast United States, specifically FMMO 7. Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute. Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling

plants in the Southeast. Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

194. The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (i.e., sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (i.e., buy-side). The market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

195. DFA, both by itself and in combination with DFA-controlled marketing agencies DMS and SMA, has attempted to and continues to attempt to possess market power in the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Southeast market and maintains a dominant position in the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants in the Southeast. DFA has acted with the specific intent to monopolize and has used and is using its market dominance in an attempt to eliminate competition from independent dairy farmers and cooperatives by, among other things, a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Dean, NDH, Defendant DFA and their Co-conspirators to control

40

Southeast dairy farmers access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

196.    DFA's scheme to monopolize has had success in restricting, excluding and foreclosing competition, and there is a dangerous probability of success of DFA monopolizing these markets.

197.    DFA's scheme and its predatory acts in furtherance of this scheme constitutes attempted monopolization in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

198.    Defendants have attempted to and continue to attempt to obtain market power in the purchase of fluid Grade A milk by fluid Grade A bottling plants in the Southeast market and they have acted with specific intent to obtain a monopsony and use their market dominance in the bottling of fluid Grade A milk by, among other things, a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Dean, NDH, Defendant DFA and their Co-conspirators to control Southeast dairy farmers access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

199.   Defendants scheme to monopsonize has had success in restricting, excluding and foreclosing competition, and there is a dangerous probability of success of Defendants monopsonizing these markets.

200.   Defendants scheme and their predatory acts in furtherance of this scheme to control the market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants in the Southeast United States constitutes attempted monopolization and monopsonization in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

201.   As a direct and proximate result of Defendants continuing violation of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

202.   Plaintiffs seek money damages from Defendants for these violations.  These damages represent the additional amount Plaintiffs would have received for sales of fluid Grade A milk in the absence of the violations alleged.  These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

203.   Plaintiffs also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT THREE**
**SHERMAN ACT SECTION 2 VIOLATION**
**Unlawful Monopolization**
**(Against DFA)**

204.   Plaintiffs incorporate by reference paragraphs 1 through 203 as if fully alleged herein.

43

205.   The relevant geographic market is the Southeast United States, specifically FMMO 7.  Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.  Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast.  Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

206.   The relevant product market consists of the market for the sales of marketing of fluid Grade A milk to fluid Grade A milk bottling plants (i.e., sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (i.e., buy-side).  The market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

207.   DFA possesses monopoly power in the market for marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Southeast market and has abused and continues to abuse that power to maintain and enhance its market dominance

in the market for the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants by unreasonably restraining trade, artificially and anti-competitively reducing the price of fluid Grade A milk purchased from Plaintiffs, eliminating competition from rival cooperatives and independent dairy farmers, and foreclosing and excluding competitors from access to fluid Grade A milk bottling plants by engaging in predatory and unlawful conduct.  This conduct includes, but is not limited to, the following acts: a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Dean, NDH, Defendant DFA and their Co-conspirators to control Southeast dairy farmers access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling

45

competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

208.   As a direct and proximate result of DFA's continuing violation of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

209.   Plaintiffs seek money damages from DFA for these violations.  These damages represent the additional amount Plaintiffs would have received for sales of Grade A milk in the absence of the violations alleged. These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

210.   Plaintiffs also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT FOUR**
**SHERMAN ACT SECTION 1 VIOLATION**
**Unlawful Conspiracy Among Defendants to Foreclose Competition and Fix Prices**
**(Against ALL Defendants)**

211.   Plaintiffs incorporate by reference paragraphs 1 through 210 as if fully alleged herein.

212.   At all times relevant to this Complaint, Defendants have combined and conspired to eliminate competition for the purchase of fluid Grade A milk from dairy farmers in the Southeast.  In furtherance of their conspiracy, Defendants have entered into exclusive dealing arrangements with the purpose and intent of restricting access to the fluid Grade A milk bottling market in the Southeast, fixing, suppressing and stabilizing prices paid to dairy farmers for fluid Grade A milk, and excluding dairy farmers from access to

46

cooperatives and fluid Grade A milk bottling plants that might compete with Defendants in purchasing fluid Grade A milk for bottling.

213.    These arguments are *per se* violations of Section 1 of the Sherman Act, and were they not, would nonetheless violate Section 1 of the Sherman Act under the Rule of Reason.

214.    The agreements that Defendants have entered, maintained, renewed, and enforced with one another have had the purpose and effect of eliminating competition for the purchase of fluid Grade A milk by and among fluid Grade A milk bottlers in the Southeast.  As a result of these agreements, Plaintiffs have been forced to accept suppressed prices for sales of fluid Grade A milk to bottlers, and otherwise have been damaged as described in this Complaint.  But for the conspiracy alleged herein, fluid Grade A milk prices obtained by Plaintiffs would have been significantly higher.

215.    In furtherance of Defendants agreement to restrain trade, Defendants have committed.  This conduct includes, but is not limited to, the following acts: a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Dean, NDH, Defendant DFA and their Co-conspirators to control Southeast dairy farmers access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to

47

further depress prices paid to Southeast dairy farmer; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

216.    The relevant geographic market is the Southeast United States, specifically FMMO 7.  Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.  Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast.  Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

217.    The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (i.e., sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (i.e., buy-

side).  The market for marketing or sales of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

218.    Collectively, Defendants enjoy monopoly and monopsony power over the market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, fluid Grade A milk bottling plants in the Southeast.  Upon information and belief, Defendants, during the relevant time period, controlled 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

219.    As a direct and proximate result of Defendants past and continuing violation of Section 1 of the Sherman Act, as well as Defendants other unlawful conduct, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

220.    Plaintiffs seek money damages from Defendants jointly and severally for these violations.  These damages represent the additional amount Plaintiffs would have received for sales of Grade A milk in the absence of the violations alleged. These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

221.    Plaintiffs also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT FIVE**
**VIOLATION OF CIVIL RICO 18 U.S.C. § 1962(a)**
**(Against Defendant DFA)**

222.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 above.

The Racketeering and Corrupt Organizations Act ("RICO") provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>
> 18 U.S.C. § 1962(a).

223.    Defendant DFA is, and was at all times relevant to this action, a RICO "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

224.    National Dairy Holdings is an entity that constitutes an enterprise engaged in, and whose activities affect, interstate commerce or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962.  The National Dairy Holdings Enterprise (hereinafter "The NDH Enterprise") existed separate and apart from the pattern of racketeering activity.

225.    The NDH Enterprise was established and financed as a limited partnership by DFA using member farmers' proceeds and/or equities for the initial purpose of purchasing 11 bottling facilities the DOJ required to be divested before Dean Foods would be allowed to merge with Suiza Foods.

226.    DFA executives made material misrepresentations and/or omissions by failing to inform member farmers of its conspiracy to corner the market, thereby reducing their milk prices.  Specifically, DFA continuously made lulling promises via mailings, wirings, and representations from its spokespersons that it was working to get the farmers' higher prices.

50

227.    At its initial inception, DFA owned 50% of NDH, but in 2007 DFA, using member farmers' proceeds and/or equities, it purchased an additional 37.5%, giving it a total of 87.5% interest in the NDH Enterprise from that year forward.

228.    The bottling facilities operated by NDH purchase raw Grade A milk from diary farmers and process and bottle the liquid, then sell it wholesale to retailers and other buyers.

229.    In the years that followed, DFA acquired more facilities for NDH, including but not limited to: Barber/Meadow Gold Dairies, Huntsville, AL; National Dairy Holdings, Decatur, GA; Dairy Fresh Cowarts, AL; Dairy Fresh Greensboro, AL; Dairy Fresh Pritchard, AL; Borden, Lafayette, LA; Dairy Fresh, Baker, LA; Dairy Fresh, Hattiesburg, MS; Goldenrod, Madisonville, KY; Flav-O-Rich, London, KY; Coberg, Charleston, SC; Chatanooga Dairy, Chatanooga, TN; Valley Rich, Roanoke, VA; Flav-O-Rich, Bristol, VA.  DFA invested millions in the NDH Enterprise before it was finally sold to Grupo LALA in May of 2009.

230.    With each investment and/or acquisition, DFA, through NDH, gained more of the Grade A milk market, thus enabling it to further artificially depress and fix Plaintiff farmers' milk prices.

231.    Although the facilities were purchased by Grupo LALA in May, 2009, upon information and belief, the prior full-supply agreements with DFA remain intact. Additionally, upon information and belief, the former management and employees, including Chairman and CEO (and DFA co-conspirator) Allen Meyer remain in their positions.  The Justice Department, in a former lawsuit against DFA, dubbed Meyer DFA's "close business ally."

232.    In addition, and/or in the alternative, the DFA Outside Venture Enterprise (hereinafter "DFA Ventures Enterprise") constitutes an enterprise engaged in, and whose activities affect, interstate commerce.  The DFA Ventures Enterprise includes, but is not limited to: DFA's trucking company, DairiConcepts (joint venture with New Zealand company Fonterra) and Southwest Cheese (joint venture with Glanbia).

233.    Upon information and belief, DFA has, using members' equities and/or other monies, acquired 100% of the trucking company.  It has also used farmer money to invest $25 million into DairiConcepts, giving it 50% interest in that joint venture with Fonterra and equal voting rights on a shared board.   DFA has additionally acquired an estimated 68% of the 50% "milk member" interest in Southwest Cheese, a joint venture 50% owned by Glanbia and 50% owned by Milk Member LP.  Upon information and belief, DFA executive David Jones serves as the DFA representative on Southwest Cheese's board.

234.    The Defendants, during the past ten years, engaged in two or more predicate acts of racketeering as described more fully above and in the following paragraphs.

235.    These predicate acts of racketeering resulted in significant profits, a portion of which was then used to invest, directly or indirectly, into the acquisition, establishment and/or operation of The NDH Enterprise and/or the FDA Ventures Enterprise.

236.    The ultimate purpose of the fraudulent scheme was for Defendants to exert their monopoly/monopsony power to extort and/or defraud Plaintiff dairy farmers out of profits by deceptively utilizing Plaintiff's money, business, or property to eliminate competition and thereafter artificially depressing and fixing the price of raw milk.  Profits realized from this fraudulent scheme were used to invest in the acquisition, establishment

and/or operation of the NDH Enterprise and/or the DFA Ventures Enterprise.

**Predicate Acts of Racketeering Relating to all RICO Claims**

237.    As set forth in greater detail above, for the purpose of devising and carrying out their scheme and artifice to defraud Plaintiffs by means of false and fraudulent pretenses, representations and/or omissions, the Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited with private and commercial interstate carriers and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C. § 1341, as follows, or aided and abetted the following criminal acts[6]:

     a. A mailing dated April 13, 2007, sent from DFA corporate to member farmers, outlining their milk check proceeds.  The pay stub includes such deductions as "advertising and promotion" fees, "capital retains," and having a "Grade A pay price" that is below the true market value of the milk as sold in a competitive market.

     b. A mailing dated Sept. 13, 2007, sent from DFA corporate to Southeastern member farmers, outlining their milk check proceeds.  The pay stub includes such deductions as "advertising and promotion" fees, "capital retains," and having a "Grade A pay price" that is below the true market value of milk as sold in a competitive market.

     c. A mailing dated May 19, 2008, sent from DFA corporate to all DFA member farmers.  The letter discusses the "capital retains" deducted from members' monthly milk checks in 2007 and represents that these deductions will result in a favorable investment return for the farmers.  Additionally, the letter states that the deduction "insures that investment in the cooperative is held largely by current members."

     d. A mailing dated December 13, 2008, sent from DFA corporate to Southeastern member farmers, outlining their milk check proceeds.  The pay stub includes such deductions as "advertising and promotion" fees, "capital retains," and having a "Grade A pay

---

[6] Such mailings as the milk check stubs occurred every month for the relevant time period.  For brevity's sake, only a few are listed here with 9(b) specificity.

price" that is below the true market value of the milk as sold in a non-monopolized, competitive market.

e.  A mailing dated January 20, 2010, sent from DFA corporate in Kansas City, Mo., to member farmers outlining their specific milk marketed in 2009. The summary contains such deductions as "advertising and promotion," and "capital retain."

f.  A mailing dated June 12, 2010, sent from DFA corporate to member farmers, outlining their milk check proceeds. The pay stub includes such deductions as "advertising and promotion" fees, "capital retains," and having a "Grade A pay price" that is below the true market value of the milk as sold in an non-monopolized, competitive market.

g.  A mailing dated Feb. 12, 2011, sent from DFA corporate to member farmers, outlining their milk check proceeds. The pay stub includes such deductions as "advertising and promotion" fees, "capital retains," and having a "Grade A pay price" that is below the true market value of the milk as sold in a competitive market.

h.  A mailing dated March 12, 2011, sent from DFA corporate to member farmers, outlining their milk check proceeds. The pay stub includes such deductions as "advertising and promotion" fees, "capital retains," and having a "Grade A pay price" that is below the true market value of the milk as sold in a competitive market.

i.  A mailing dated May 18, 2010, sent from DFA corporate offices to all DFA member farmers. The letter discusses the "capital retains" deducted from members' monthly milk checks in 2009 and represents that these deductions will result in a favorable investment return from the cooperative. Additionally, the letter states that the deduction "insures that investment in the cooperative is held largely by current members."

j.  A mailing dated January 21, 2011, sent from DFA corporate offices in Kansas City, Mo., to member farmers outlining their specific milk marketed in 2010. The summary contains such deductions as "advertising and promotion," "capital retain" and "cwt investment." The mailing reflects a purchase price lower than the true market value of the milk as sold in a competitive market.

k.  A mailing dated March 18, 2011 sent from James "Mickey" Childers, Southeastern DFA Chairman to Southeast area members. The communication, in the form of a letter, announces that an additional .20/cwt has been added to members check as "a

54

> continued result of efficiently operating your business and
> managing costs in the marketing of your milk."

238.    For the purpose of devising and carrying out their schemes and artifice to defraud

Plaintiffs by means of false and fraudulent pretenses, representations and promises, the

Defendants caused to be transmitted by means of wire communication in interstate

commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or

faccimile in violation of 18 U.S.C. § 1343, as follows:

     a.  An interstate telephone conversation that took place on December 17, 2002, between Dean official Marty Devine and the Dean milk procurement team outlining the conspiracy, noting that, pursuant to a prior meeting Defendant Engels "stated that he would live up to his word; and based upon this, we are going to have to make some changes. Effective January 2003, we will be changing our relationship with the field. We will be outsourcing the field operations to Dairy Marketing Services."

     b.  An email from Dean spokesperson Liliana Esposito sent on February 21, 2011 to the Dairyherd Network regarding antitrust lawsuits filed in Tennessee. Esposito claimed that industry competition was "alive and flourishing" and stated that Dean believes that "farmers have many outlets for their raw milk at competitive prices." Dean caused this communication to be published on the internet at: http://www.dairyherd.com/dairy-news/latest/116620503.html

     c.  A wiring sent on November 16, 2010 from a DFA account located at Harris Bank located in Chicago, Illinois, purporting to be full payment of member farmer's proceeds from the sale of his milk.

     d.  A wiring sent on November 26, 2010, from a DFA account located at Harris Bank located in Chicago, Illinois, purporting to be full payment of member farmer's proceeds from the sale of his milk.

     e.  A wiring sent on June 15, 2010, from a DFA account located at Harris Bank located in Chicago, Illinois, purporting to be full payment of member farmer's proceeds from the sale of his milk.

     f.  A wiring sent on June 28, 2010, from a DFA account located at Harris Bank located in Chicago, Illinois, purporting to be full payment of member farmer's proceeds from the sale of his milk.

g. A wiring sent on April 26, 2007, from a DFA account located at Harris Bank located in Chicago, Illinois, purporting to be full payment of member farmer's proceeds from the sale of this milk.

239. As set out in greater detail above, certain Defendants or their agents have used extortion to obstruct and affect commerce, with the specific intent and purpose of obtaining another's money by instilling fear in that person, which fear was reasonable. Each instance of such conduct constitutes a violation of 18 U.S.C. § 1951 and is a distinct predicate act of racketeering.  The Defendants' violations of § 1951 include, but are not limited to:

a. Each year during the applicable time period, DFA has obtained Plaintiff dairy farmers' monetary property through the threat of economic harm. Specifically, due to the fraudulent conspiracy between Dean, Defendant DFA, Defendant SMA and DMS to monopolize/monopsonize the Grade A milk market, Plaintiff farmers were and are continuously forced to give up milk check profits and equities under the threat of being denied access to the facilities necessary to stay in business.  This deprivation of property constitutes extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.

b. Extortion of competing coop Southeast Milk in Florida that began in 2003. DFA obtained annual payments in the amount of $3.5 million from Southeast Milk through the fear of economic harm.  Specifically, DFA forced Southeast Milk to pay DFA in order to retain access to Dean and NDH bottling facilities, without which Southeast Milk's farmers would have been forced out of business.

c. Extortion of Plaintiffs' intangible property rights and intangible rights to their conduct business free from and without fear of the extortionate conduct alleged herein.

240. The Defendants traveled in interstate or foreign commerce and/or used the mail or any facility in interstate commerce, with the intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of any unlawful activity and thereafter performed or attempted to perform the promotion, management,

establishment or carrying on of an unlawful activity in violation of 18 U.S.C.

§ 1952(a)(3)(A).  Specifically, Defendants mailed extortionate letters to competing coops

via interstate commerce and traveled in interstate commerce to executive meetings where

the scheme to extort DFA member farmers out of rightful proceeds was promoted and

facilitated.

241.    On information and belief, the Defendants on numerous occasions, by means

affecting interstate commerce, made financial transactions using what Defendants knew

to be the proceeds of unlawful activity constituting a felony under state, federal or foreign

laws with the specific intent to promote the carrying on of unlawful activity in violation

18 U.S.C. § 1956(a)(1)(A)(i).  Specifically, Defendants used proceeds derived from an

unlawful activity to purchase and lease properties, interests in joint ventures and/or

processing facilities with the specific intent to promote their activities in violation of 18

U.S.C. §§ 1341, 1343, 1951 and 1952. Each such transaction constitutes a separate

predicate act of racketeering activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

242.    Upon information and belief, on numerous occasions the Defendants, knowing

that they were transporting money converted and/or obtained by fraud, caused money in

an amount greater than $5,000 to be transmitted and/or transferred through interstate

commerce in violation of 18 U.S.C. § 2314.  On information and belief, Defendants knew

the money they caused to be transferred was obtained by illegal means.  Each such

transaction constitutes a separate violation of 18 U.S.C. § 2314 and is a distinct predicate

act of racketeering.

**Pattern of Racketeering Activity**

243.    The Defendant's numerous illegal acts in connection with their fraudulent

schemes, described in the previous paragraphs, constitute predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1).

244.    The racketeering activity forms a pattern in that the acts have the same or similar purpose, results, participants, victims and methods of commission.  The purpose of the racketeering acts was to unlawfully obtain, steal, convert and/or extort money and proceeds to be used to further Defendants' fraudulent scheme to monopoloize / monopsonize the Grade A raw milk market in order to artificially depress prices paid to dairy farmers, thus yielding themselves as processors higher profits.  The result of the racketeering activities was that prices paid to the farmers were lowered and competition eliminated.

245.    The activities had the same participants: DFA, Dean, NDH, SMA, DMS, and the same victims: dairy farmers in milk order seven.  The methods of commission were the same as well: Defendants would buy all processing facilities, thereby cornering the market, then use that monopoly to extort independent farmers into joining either DFA and or SMA/DMS and then accepting the same artificially suppressed low prices that DFA members received.  This achieved the desired effect of 1) lowering the price paid to dairy farmers, thus decreasing the overhead of bottlers such as Dean and the bottling ventures of DFA and 2) garnering executive Defendants large payouts in the form of corporate bonuses and sweetheart deals, such as Hanman's millions he earned for increasing DFA's market share and Engels' millions he received for a rise in Dean stock.

246.    After the farmers were extorted into being and/or remaining members, Dean and DFA executives used DFA's status as a cooperative to mislead farmers into believing it was looking out for their best interests and was seeking the best, most competitive prices

for their milk.  In actuality, it was seeking the lowest prices in order to make higher profits for its executives, joint ventures and co-conspirators.

247.    The predicate acts constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because the predicate acts were related and continuous.

248.    Continuity is demonstrated by the fact that the numerous predicate acts began as early as 2001 and continue through the present.  It is further demonstrated by the fact that the predicates constitute the regular manner in which Defendants conduct business.

249.    Plaintiffs were, and continue to be, injured in their business and property by reason of Defendants' use or investment of income derived from a pattern of racketeering activity and by the commission of the racketeering acts. The Defendants' use or investment of the racketeering income enabled the NDH Enterprise to further monopolize/monopsonize the market, thus further damaging Plaintiffs raw milk prices. Additionally and/or in the alternative, the Defendants' use or investment of the racketeering income was invested in the DFA Joint Ventures Enterprise and thereby converted from the coffers of member farmers.

**COUNT SIX**
**VIOLATION OF CIVIL RICO 18 U.S.C. § 1962(b)**
**(Against Defendant DFA)**

250.    The allegations of paragraphs 1 through 182 and 222 through 249 are re-alleged and incorporated by reference as if fully set forth herein.

251.    The Racketeering and Corrupt Organizations Act ("RICO") provides:

> It shall be unlawful for any person through a pattern of
> racketeering activity or through a collection of an unlawful
> debt to acquire or maintain, directly or indirectly, any
> interest in or control of an enterprise which is engaged in,
> or the activities of which affect, interstate or foreign
> commerce.

59

18 U.S.C. § 1962(b)(2011).

252.    Defendant DFA is, and was at all times relevant to this action, a RICO "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

253.    National Dairy Holdings is an entity that constitutes an enterprise engaged in, and whose activities affect, interstate commerce or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962.  The NDH Enterprise existed separate and apart from the pattern of racketeering activity.

254.    The parameters of the NDH Enterprise are described more fully in paragraphs 224 through 231 above.

255.    In addition, and/or in the alternative, the DFA Ventures Enterprise constitutes an enterprise engaged in, and whose activities affect, interstate commerce.  The DFA Ventures Enterprise includes, but is not limited to: DFA's trucking company, DairiConcepts (joint venture with New Zealand company Fonterra) and Southwest Cheese (joint venture with Glanbia). The parameters of the DFA Ventures Enterprise are described more fully in paragraphs 232 through 233 above.

256.    Through the pattern of racketeering activity described above, Defendant DFA acquired or maintained, directly or indirectly an interest in or control over the NDH Enterprise and/or the DFA Ventures Enterprise by purchasing stock ownership interests and by possessing various methods of control within the NDH Enterprise and/or DFA Ventures Enterprise.

257.    Plaintiffs were injured in their business or property by reason of Defendants' violation of 18 U.S.C. § 1962(b) and by the commission of predicate acts of racketeering.

**COUNT SEVEN**

60

**VIOLATION OF CIVIL RICO 18 U.S.C. § 1962(c)**
**(Against Defendants DFA and Hanman)**

258.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 and 222 through 257.

The Racketeering and Corrupt Organizations Act ("RICO") provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c)(2011).

259.    Defendant DFA, Defendant SMA, DMS and Defendant Hanman are, and were at all times relevant to this action, RICO "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

260.    The "Processing Cartel Enterprise" constitutes a group associated in fact within the meaning of 18 U.S.C. §§ 1961(4) and 1962, and is comprised of various milk processing facilities acquired and/or operated and/or controlled by co-conspirator Defendants in the Southeastern and Appalachian Milk Orders.

261.    Specifically, the "Processing Cartel Enterprise" includes but is not limited to: Barber/Meadow Gold Dairies, Huntsville, AL; National Dairy Holdings, Decatur, GA; Dairy Fresh Cowarts, AL; Dairy Fresh Greensboro, AL; Dairy Fresh Pritchard, AL; Borden, Lafayette, LA; Dairy Fresh, Baker, LA; Dairy Fresh, Hattiesburg, MS; Goldenrod, Madisonville, KY; Flav-O-Rich, London, KY; Coberg, Charleston, SC; Chatanooga Dairy, Chatanooga, TN; Valley Rich, Roanoke, VA; Flav-O-Rich, Bristol, VA; Barber Dairy, Birmingham, AL; Milk Products of Alabama, Decatur, AL; PET Dairy, Baxley, GA; Mayfield Diary Farms, Braselton, GA; Brown's Dairy, New Orleans,

LA; Foremost Dairy, Shreveport, LA; Dairy Fresh, Winston-Salem, NC; Pet Dairy, Florence, SC; Pet Dairy, Spartanburg, SC; Mayfield Dairy Farms, Athens, TN; Pet Dairy, Kingsport, TN; Country Delight, Nashville, TN; Purity Dairy, Nashville, TN; Pet Dairy, Portsmouth, VA; Shenandoah's Pride, Springfield, VA; together with Defendants DFA, Dean, DMS, SMA and individuals associated with them.

262.    The Processing Cartel Enterprise is an ongoing organization with consensual decision-making structure, which is characterized by overlapping and interlocking stock ownership, directorship, membership and/or management.

263.    The Processing Cartel Enterprise exists separate and apart from the pattern of racketeering alleged and the Defendants themselves.  It has the shared purpose of limiting dairy farmers' access to geographically efficient bottling facilities in order to force them to join DFA and/or its marketing affiliates SMA or DMS.

264.    In this manner, by joining forces, Defendants used the Processing Cartel Enterprise to eliminate competition and thereby artificially lower and fix the prices paid for raw milk, yielding themselves higher profit margins. The Processing Cartel Enterprise's monopolization/monopsonization would not have been possible without Defendants' joint efforts and collusion.

265.    Defendant DFA was associated with the Processing Cartel Enterprise by holding various positions of control within, and an ownership interest in, facilities that are part of the Processing Cartel Enterprise through its acquired controlling interest in NDH.

266.    Defendant SMA was associated with the Processing Cartel Enterprise by holding a position of control within the Processing Cartel Enterprise.  For example, SMA through its role as "marketing agent," handles payments between processors and dairy farmers.

267.    Defendant Hanman was associated with the Processing Cartel Enterprise by holding various positions of control within the Enterprise.  Hanman acted was DFA's Chief Executive Officer from its formation in 1998 until he retired from that position on December 31, 2005.  Hanman also served on the management committee of Dairy Management LLC, the sole general partner of NDH.  Through these positions, Hanman exerted substantial control over the Processing Cartel Enterprise.

268.    Through the pattern of racketeering activity described above, the Defendants conducted or participated in, directly or indirectly, the affairs of the Processing Cartel Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

269.    As a proximate result of the pattern of racketeering activity and RICO violations, Plaintiffs were injured in their business or property.

## COUNT EIGHT
### VIOLATION OF CIVIL RICO 18 U.S.C. § 1962(d)
### (Against ALL Defendants)

270.    Plaintiffs re-allege and incorporate by reference 1 through 182 and 222 through 269.

271.    18 U.S.C. § 1962(d) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

272.    Defendants agreed and conspired to a) violate 18 U.S.C. § 1962(a) by aiding DFA to acquire an interest in, or the establishment or operation of, the NDH Enterprise and/or the DFA Ventures Enterprise b) commit a pattern of racketeering activity as described above, and c) commit wrongful acts in furtherance of the conspiracy.

273.    Defendants agreed and conspired to a) violate 18 U.S.C. § 1962(b) by aiding DFA

to acquire an interest in, or control of, the NDH Enterprise and/or the DFA Ventures Enterprise b) commit a pattern of racketeering activity as described above, and c) commit wrongful acts in furtherance of the conspiracy.

274. Defendants agreed and conspired to a) violate 18 U.S.C. § 1962(c) by aiding each other in operating or conducting the affairs of the Processing Cartel Enterprise and/or DFA through a pattern of racketeering activity, b) commit a pattern of racketeering activity as described above, and c) commit wrongful acts in furtherance of the conspiracy.

275. As early as 1997-1998, Defendants Engels and Hanman formed a "strategic partnership" offering a trade-off: Engels would help "convert" non-DFA member farmers to DFA by forcing them out per full supply agreements (thus heaping millions of dollars of corporate bonuses to Hanman for his accomplishment of greater market shares), and Hanman would offer below market milk prices to Dean once competing coops and independent farmers were forced into either DFA or under SMA or DMS.

276. In 1997, a letter was sent from Defendant Engels to Hanman, stating that they have a "common interest and mutual plan."

277. In 1998, several meetings were held between Defendants Engels and Hanman, whereby DFA agreed to use rebates and credits to help Suiza expand.

278. In a letter sent by Engels to Hanman in 1998, Engels outlined the forthcoming conspiracy and Dean's goal to help DFA convert independent producers and expand DFA's coverage.

279. During the Suiza/Dean divesture to NDH, the DOJ mandated several amendments to avoid antitrust concerns. DFA (NDH) and Dean immediately amended those

provisions back into the agreement without informing the DOJ they had done so.

280. As part of the conspiracy, Defendant DFA had assured the DOJ that NDH would be a valid competitor to Dean and that DFA "does not and will not control or have input regarding NDH." In fact, however, Defendant Hanman served on NDH's management committee wherein he had veto power over NDH's operational decisions, and DFA later acquired nearly, if not all, ownership and control of NDH.

281. Full-supply agreements were entered into by Dean and NDH with the knowledge that DFA was currently unable to fulfill these contracts. Defendants did so because, pursuant to their illicit conspiracy, they knew that all independent farmers would thereafter be forced to join DFA, thereby enabling DFA to meet the supply demands of these contracts.

282. Defendants committed wrongful acts in furtherance of the conspiracy, such as buying and closing former independent processing plants and terminating historically profitable raw milk supply contracts with independent farm cooperatives who owned competing milk bottling plants and replacing that raw milk supply with milk exclusively from DFA, even when initially Dean would have lost money by paying slightly higher prices to DFA. Due to the illicit conspiracy, Dean took this initial hit because it knew non-DFA member farmers would eventually be forced to join DFA and thereafter DFA could reduce prices across the board because there would be no competition.

283. Additionally, as part of the illegal conspiracy, Defendants knew that SMA would be able to haul in vast amounts of cheaper milk from outside areas, further reducing the mailbox price Southeastern farmers were paid and charge them excessive hauling fees to truck in the outside milk as per the terms of the full-supply contracts.

65

284.   Defendant SMA and DMS committed wrongful acts in furtherance of the conspiracy such as, upon information and belief, hauling milk unnecessarily long distances in order to provide SMA's executive, James Baird, large profits for his hauling company.  Upon information and belief, SMA pays the cost of transporting Grade A milk from the Southwest at excessive rates, dictates the hauler to be used, and then deducts the price from the mailbox price of its member farmers.  In this manner, SMA and the other co-conspirators are able to further reduce the mailbox price paid to independent farmers and other cooperatives, thereby stifling competition and making money off of those non-DFA members in the process.

285.   Nearly every Saturday for ten years during the relevant time period, Defendant Hanman communicated with former Dean dairy group President Pete Schenkel about industry topics that included future milk prices and consolidation.

286.   Defendant Hanman earned multi-million dollar bonuses based on increases in value or returns on equity on Suiza-Dean bottling plants and DFA's joint venture bottling affiliates during the 1998-2004 time period.  Defendant Hanman was offered no bonuses based upon increased milk prices to DFA member farmers.

287.   Executive officers of Dean, Defendant DFA and NDH admitted that prices did not go into effect until approved by the other corporate co-conspirators.

288.   The numerous additional wrongful acts committed in furtherance of the conspiracy are detailed throughout the Complaint.

289.   As a proximate result of the overt acts taken by Defendants, Plaintiffs have suffered injury to their business and property.

**COUNT NINE**
**BREACH OF CONTRACT**
**(Against Defendant DFA)**

290.    Plaintiffs incorporate and reference paragraphs 1 through 182 as if fully alleged herein.

291.    DFA markets its member dairy farmers' Grade A milk pursuant to a standard form member agreement.

292.    The member agreement requires DFA "to market all milk received from member in a form and manner . . . for the advantage and benefit of all members." ¶ 2.a.

293.    The member agreement requires that DFA use the power and authority granted by each member to collect monies due the member from the sale of member's milk to, *inter alia*, "pay, or make provisions for the payment of all ordinary and necessary expenses incurred in the marketing of Member's Milk". ¶ 3.a.

294.    The member agreement also incorporates the DFA Bylaws, including the following articles:

> "PURPOSES OF THE ASSOCIATION: . . . to engage in any lawful act or activity for which an Association may be organized under the Kansas Cooperative Marketing Act." § III.c.

> "MEMBERSHIP: . . . This association shall be operated on a cooperative, non-profit basis for the mutual benefit of its members as producers . . . ." § V.b.

295.    DFA materially breached its obligations to Plaintiffs under the Member Agreement and DFA Bylaws by:

    a.  Entering into transactions and engaging in conduct that disadvantaged the Southeast DFA member dairy farmers and were not beneficial to Southeast DFA member dairy farmers interests;

    b.  Engaging in unlawful acts or activities; and

   c.   Causing southeast DFA member dairy farmers to pay expenses for the marketing of their Grade A milk that were not ordinary and necessary.

296.   Plaintiffs have performed their obligations under the Member Agreement.

297.   Plaintiffs are entitled to recover all damages caused by DFA's breach, including compensatory, incidental, consequential, punitive damages, attorneys fees and pre- and post- judgment interest.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. Pro. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, and for the wrongs cited factually and legally in this Complaint, judgement should be rendered in Plaintiffs' favor against Defendants as follows:

   a.   An award of compensatory damages that will fairly represent the economic injuries to the Plaintiffs' business and property;

   b.   Adjudge and declare that Defendants have engaged in unlawful conduct in violation of §§ 1-2 of the Sherman Act, 15 U.S.C. §§1-2;

   c.   Preliminarily and permanently enjoin Defendants from violating sections 1-2 of the Sherman Act, 15 U.S.C. §§1-2;

   d.   Declare null and void the full-supply agreements by and between Dean, NDH (Grupo LALA) and DFA as described herein;

   e.   Preliminarily and permanently enjoin DFA, SMA, and/or any entity controlled by any of them, from entering into full-supply agreements as described herein;

   f.   Order DFA, their subsidiaries or joint ventures to divest fluid Grade A milk bottling plants necessary to restore competition in the relevant milk

orders;

g.  Against all Defendants, jointly and severally, award Plaintiffs damages in an amount to be proven at trial, to be trebled, with interest and the cost of this suit, including attorneys' fees and punitive damages;

h.  Against DFA award Plaintiffs compensatory, incidental, consequential and punitive damages for breach of contract in an amount to be proven at trial with interest and the costs of this suit, including attorneys' fees;

i.  Against Hanman compensatory, incidental consequential and punitive damages for tortious interference in an amount to be proven at trial with interest and the costs of this suit, including attorneys fees; and

j.  Award such further relief, including structural remedies, as the Court deems just and proper.

Respectfully submitted,

/s/ *Vicki Bobo Eastland*
Vicki Bobo Eastland (MSB 102194)
Jacob K. Eastland (MSB 102184)
Hiram C. Eastland, Jr. (MSB 5294)
EASTLAND LAW OFFICES, PLLC
307 Cotton Street
Greenwood, MS 38930
Office: (662) 453-1227
Fax: (601) 510-9697
E-Mail: vickieastland@me.com

Co-Counsel

John H. Ott (MSB 3950)
Jacob Ray (MSB 101466)
JOHN H OTT, ATTORNEY AT LAW
1116 Delaware Ave.
McComb, MS 39649-1684
Office: (601) 684-6155
Fax: (601) 240-0264

## CERTIFICATE OF SERVICE

I certify that on the 29th day of May, 2012, a true and correct copy of Plaintiffs' Amended Complaint was served by operation of the electronic filing system of the U.S. District Court for the Southern District of Mississippi upon all counsel who have consented to receive notice of filings in the matters styled *Jesse L. Andrews, et.al vs.*

*Dairy Farmers of America, Inc.*, 2:11-cv-97.


Dated: May 29, 2012


<u>/s/ Vicki Bobo Eastland</u>
*Counsel for Plaintiffs*